DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal from the Lucas County Court of Common Pleas, Juvenile Division, which granted permanent custody of Samuel M. to appellee Lucas County Children's Services ("LCCS") and terminated the parental rights of appellant Norbert B. and of Halloran M. Because we find that the trial court's decision is supported by clear and convincing evidence, we affirm the decision of the trial court.
 {¶ 2} Samuel M. was born in 1998, and has been in the temporary custody of his maternal aunt, Treyvon M. since February 2001.[1] Samuel's parents, appellant Norbert B. and Halloran M., have both been incarcerated for much of Samuel's life, and presently neither is in a position to care for Samuel. However, both Halloran and Norbert have expressed their desire that appellant Christina P., Norbert's mother and Samuel's paternal grandmother, have legal custody of Samuel. Christina was allowed to intervene and file a motion for legal custody. Appellee LCCS sought permanent custody to facilitate Samuel's adoption by Treyvon M. The trial court granted permanent custody to LCCS, and Norbert and Christina now appeal.
 {¶ 3} A hearing was held on LCCS's motion for permanent custody and on Christina's motion for legal custody in April 2003. The caseworker, Debra Wedding, was the first to testify. Wedding testified that when she was assigned the case in February 2001, Samuel was already in the temporary custody of Treyvon. Wedding indicated that neither Halloran nor Norbert participated in services offered to them and that both were incarcerated for a significant portion of Samuel's life. Both also had problems with substance abuse. Initially, Halloran told Wedding that she wanted Samuel to remain with Treyvon, but she later changed her mind and stated that she wanted the child to live with Christina, who had custody of Halloran's and Norbert's other two children who were, at the time of the hearing, 14 and 16 years old.
 {¶ 4} LCCS's initial goal was to grant legal custody of Samuel to Treyvon, but after Wedding spoke with Treyvon about the difference between legal custody and permanent custody, Treyvon decided that she wanted to adopt Samuel. Wedding conducted a home study and made favorable findings. Wedding stated that Samuel had lived with Treyvon for over two years, that he was doing well there, and that he was close in age to Treyvon's son. She also testified that Treyvon had always allowed Samuel to visit with his grandmother and siblings, these visits taking place at least weekly.
 {¶ 5} Wedding stated that she did not consider Christina for custody until a year earlier when Christina first started asking for custody. However, Wedding indicated that she had concerns about Samuel living with Christina. One concern was that when Samuel was visiting with Christina the previous summer, Samuel wandered off outside in search of his siblings (who were supposed to be watching him) and was brought back to Christina's house by the police. At that point, after speaking with Samuel's guardian ad item, LCCS decided to terminate overnight stays with Christina.
 {¶ 6} Wedding testified that she believed that permanent custody to the agency was in Samuel's best interest.
 {¶ 7} On cross-examination, Wedding testified that, aside from the incident with Samuel wandering off the previous summer, she had no real concerns about Christina's home and that Samuel's siblings appeared to be doing fine with their grandmother. In fact, she testified that she would have no real concerns about Samuel resuming his overnight visits as long as Christina understood that she (Christina) was the person ultimately responsible for Samuel's safety (as opposed, apparently, to the teenage siblings), and as long as Christina did not take the child out of town without notifying Treyvon. She also indicated that, although she had visited Christina's home on one occasion, she did not conduct a home study because Samuel had by that time been placed in a stable environment with Treyvon and there was "no decision to move Sam to another placement." When asked whether it was true that Samuel had previously lived with Christina, Wedding testified that "there were different people saying that he was with them at different points," and she could not substantiate where Samuel had lived before he lived with Treyvon.
 {¶ 8} When asked about Treyvon's home, Wedding testified that Treyvon is not married but lives with the father of her younger child, a five or six year old son. (Treyvon's teenage daughter also lives in the home.) She stated that Treyvon works 20 to 30 hours a week. Wedding also admitted that Treyvon's name did not appear on a list of persons present at Samuel's adjudication hearing, though she could not independently recall whether or not Treyvon was there.
 {¶ 9} With regard to the parents' involvement in Samuel's life, Wedding testified that, to her knowledge, Halloran was the primary caretaker for Samuel for only a short amount of time and that Norbert was never the primary caretaker. She reiterated that she was unable to trace Samuel's custodial history before he went to live with Treyvon, indicating that, in addition to various relatives, Samuel may have lived with a non-family friend. With regard to Christina's care of Samuel, Wedding testified that Christina had taken Samuel out of town for three or four days over Easter without informing Treyvon where she was taking him. Wedding indicated that when she confronted Christina with this problem, Christina's reaction was that she was unaware that she had to notify anyone that she was taking the child out of town.
 {¶ 10} As for the future, Wedding testified that Treyvon has been good about allowing visitation between Samuel, his siblings, and their grandmother and that she believed that this would continue even after adoption as long as Treyvon was comfortable that Samuel was not around substance abusers. However, Wedding had concerns that if Christina were granted legal custody, she would not allow Treyvon and her children to visit with Samuel.
 {¶ 11} Finally, Wedding testified that Treyvon has talked of marrying Anthony B., the man with whom she lived, that they have been together for more than six years, that Anthony does well with Samuel, that Anthony is, of late, employed, that she conducted a police check on Anthony, that Anthony and Treyvon were in the process of buying a home, and that Samuel had lived longer with Treyvon and Anthony than he had any other place in his life.
 {¶ 12} On redirect examination, Wedding expressed her opinion that permanent custody to LCCS was in Samuel's best interest because, if Treyvon were allowed to adopt Samuel, Samuel would not be "bounced around" anymore and would have a stable environment.
 {¶ 13} Samuel's mother, Halloran, testified that she wished for Samuel to be placed with Christina because Christina was a "better provider" and because Samuel could then live with his siblings. She also stated that she only initially requested that Treyvon have custody because Christina was, at the time, in Mississippi caring for a relative. She indicated that, upon her release from incarceration in May 2004, she planned to move in with Christina and, in time, when she got herself together, to regain custody of Samuel.
 {¶ 14} On cross-examination, Halloran testified that, though Norbert was incarcerated, she had recently communicated with him and he wished for Christina to have custody of Samuel. She also testified that Christina has never denied her the opportunity to have contact with her older children but that Treyvon had denied her contact with Samuel.
 {¶ 15} Halloran then testified about her extensive history of incarceration, her convictions for burglary and parole violations, her substance abuse, and her failure to get treatment as ordered. She indicated that she attended drug abuse classes in prison; however, she admitted that she did not have any proof that she actually attended. Halloran was asked on cross-examination about her wishes for Samuel, and she testified that, despite the fact that her other two children have been basically raised by their grandmother, she hoped to "get [her]self together" and raise Samuel. She believed that she could accomplish this within six to eight months of her release from prison. Samuel's guardian ad item asked Halloran, "So what you would like to see happen is Sam removed from Treyvon, given to [Christina] and them removed from her home?" Halloran responded, "No, I don't want to remove Sam from anywhere. No, I just don't want to not ever see my baby again. That's all I want." She then testified that she has not seen Samuel for two years because nobody arranged for him to visit her while she was incarcerated.
 {¶ 16} On cross-examination by LCCS's attorney, Halloran admitted that although she has been employed in the past, she has never held down a job for more than one year. She then admitted to convictions for disorderly conduct involving intoxication, soliciting ("several times"), obstructing official business, burglary, and loitering. She admitted to twice being in substance abuse treatment. She left one treatment center after three days.
 {¶ 17} On redirect examination Halloran's attorney asked her why she believed that, following this incarceration, she could be an effective parent to Samuel when she has not been in the past. Halloran testified,
 {¶ 18} "[P]rior times I didn't have it in my heart to do what I was doing. This time I have changed. I feel in my heart that I need to stop. I am tired of going to jail. I need to try at least in one of my kids' lives and me and Sam have a special bond. I've been with Sam since he was born minus the two times that I've been incarcerated. The first time was 11 months and then this time was 22 months."
 {¶ 19} On re-cross examination, Halloran testified that she attended 12 parenting classes while incarcerated and she described the types of topics they covered. Finally, she testified that she thought it was in Samuel's best interest to be with Christina and be raised with his siblings.
 {¶ 20} Christina testified next. According to Christina, her two grandchildren who live with her (Samuel's siblings) are doing well in her home; they are good children who help around the house and earn good grades in school. Christina stated that they see Samuel about every other week. She testified that she owns a three-bedroom house, and should she receive legal custody of Samuel, he would share a bedroom with his older brother. Christina explained that she is retired from the postal service, where she worked for 15 years.
 {¶ 21} Christina explained the incident where Samuel was reported to have wandered off and been escorted back by the police. According to Christina, Samuel came in the house to re-fill a water gun and then ran back outside where he saw a girl he mistakenly thought was his sister. He apparently began to follow the girl to the corner when an officer saw him and brought him home. Christina testified, however, that Samuel was never out of her sight and the police did not file a report on the incident. She testified that she was never given the opportunity to speak with anyone at LCCS about the incident. Christina also explained about the time she took Samuel out of town, indicating that she took him just overnight to a casino in Michigan City, Indiana. She did not realize that she was not supposed to leave the state with the boy.
 {¶ 22} Christina testified that she sees Samuel approximately every other week, and when she sees him, he looks "terrible": His socks have holes in them, his shoes are too big, his shorts look like they have not been properly washed, he smells like cigarette smoke, and his clothes generally look like old "hand-me-downs." She testified that Samuel has bronchitis and that he does not eat properly — he is a "junk food eater." She says she buys better clothes to send home with him but she never sees him wearing the new clothes again.
 {¶ 23} Christina testified that she is seeking legal custody so that other family members can still see Samuel. She affirmed Halloran's testimony that Halloran will come to live with her when she is released, and Christina testified that she will be "the caregiver." She later testified (on cross-examination) that she plans to have a mother-daughter relationship with Halloran when she comes to live with her, and she expects that Halloran would tell her if she is using drugs again. When questioned about whether anyone would be so candid about using drugs, Christina indicated that she believes she can tell when someone is using drugs, and if she discovered Halloran was doing so, she would not allow her to stay in her house because it would not be good for the children. According to Christina, she has maintained a relationship with Halloran during Halloran's incarceration, and she lets the children speak with her on the phone whenever she calls.
 {¶ 24} When asked if she felt able to care for a young child at her age, Christina testified that she is retired and has nothing better to do. She testified that she receives social security and a small pension. She also indicated that Samuel's older siblings love him and that they are supportive of Christina getting legal custody of Samuel. Finally, she testified that her older grandchildren do not like to go to Treyvon's house because they do not like the way Samuel is treated there.
 {¶ 25} On cross-examination, Christina testified that Samuel lived with her from 1999 to 2001 because both of his parents were incarcerated. At some point during that period, Christina had taken Samuel down to Mississippi because she needed to care for her mother. In 2001, LCCS contacted her and asked her to bring the child back because Halloran wanted him to be placed with Treyvon. When she returned to Lucas County, she filed her motion seeking legal custody. Christina testified that Samuel and his siblings get along well, despite their age differences, and when Samuel comes to visit, he says he does not want to go back to Treyvon's house. She testified that, if she received legal custody, she would allow Samuel to visit with Treyvon and her children.
 {¶ 26} Christina then explained more about the trip to the casino. She indicated that the casino is attached to a hotel, and children are not allowed in the casino. She stated that the establishment has a play area for children and a swimming pool and it is a place where families go. She characterized the outing as a family outing and not a gambling trip.
 {¶ 27} Christina testified that she does not smoke and that the grandchildren living with her do not smoke, and she believes that cigarette smoking at Treyvon's house is exacerbating Samuel's breathing problems.
 {¶ 28} Finally, Christina testified that Halloran is a "wonderful" mother and she does not believe that Halloran's drug problems interfered with her ability to be a good parent. Christina indicated that she has let the older children visit with their mother for extended periods, and she does not believe that Halloran ever hurt or caused harm to Samuel.
 {¶ 29} Treyvon was called on rebuttal. She testified that she lives with her boyfriend, Anthony, their young son, her daughter, and Samuel and that they have a "brother, sister, dad, mom kind of environment." She indicated that Samuel was assessed through LCCS to diagnose any special needs and was found to have none, that he did have asthma when he was living with his mother but he no longer has it, and that he does not have bronchitis. She testified that he recently started attending Head Start. According to Treyvon, Samuel visits with Christina and his siblings twice a week, which Treyvon thinks is "great" because she does not want to take him away from his family.
 {¶ 30} In terms of Samuel's communication with his parents, Treyvon testified that when Norbert was not incarcerated, he visited with Samuel about every other day. She has only received one letter and one picture from Halloran, although Halloran stated in a letter that she did not know that Treyvon had moved and she (Halloran) had sent things for Samuel to Christina.
 {¶ 31} Treyvon testified that she loves Samuel as her own, and she stated that she is trying to do the best she can with Samuel and wishes her sister could get back "up on her feet" again. She added, "[U]ntil that is right, then I will keep him and do as I need to do with him." Treyvon expressed her desire to adopt Samuel but indicated that she would "always" allow him to visit with his siblings. Finally, she testified that, although Samuel is somewhat of a picky eater, he eats pretty well.
 {¶ 32} On cross-examination, Treyvon alluded to the fact if she adopted Samuel and Halloran was later able to "get herself together," she might allow Halloran to adopt Samuel. In any event, she would always allow Halloran and Norbert to visit with Samuel even though they might not be legally entitled to do so, as long as Halloran and Norbert were not using drugs. She indicated that she does not have any concerns about Samuel visiting with Christina and that she believes that Christina takes good care of him.
 {¶ 33} Treyvon was asked again on cross-examination about her family life. Treyvon stated that she has lived with Anthony for 14 years. Anthony has never had a substance abuse problem and has never been charged with a crime. Treyvon testified that she has worked at a certain Chinese restaurant for ten years and that she works 25 hours per week. She indicated that, although she is the primary wage earner in their family, Anthony works as well; Treyvon works in the evening and Anthony works during the day so that one of them is always there to care for the children.
 {¶ 34} Treyvon testified that her relationship with Halloran is "rocky" but that she would not deny Halloran visitation with Samuel. She indicated that it was not her decision to adopt Samuel — that LCCS asked her to. However, she wants whatever is best for Samuel and she wants him to have a stable home life.
 {¶ 35} Samuel's guardian ad litem filed a report expressing her opinion that permanent custody to LCCS and adoption by Treyvon would be in Samuel's best interest. The guardian ad litem noted that, though Christina has apparently done a good job with her older grandchildren, she is no longer a young woman and the older grandchildren will soon be out of the house. The guardian ad litem also found that Samuel is currently in a loving and nurturing environment with his aunt and that Halloran's and Norbert's "odds of becoming stable members of society are not terrific."
 {¶ 36} Following the hearing, the magistrate found that it would be in Samuel's best interests to be in the legal custody of Christina. Important to the magistrate was that Samuel be raised with his siblings, and she noted that Christina has done a good job with her older grandchildren. She also noted that although Christina has allowed the parents access to the children when the parents are not in jail, Christina has never relinquished control of the children to their parents. In any event, according to the magistrate, the parents have never posed a threat to the children's safety.
 {¶ 37} LCCS filed objections to the magistrate's decision, and the trial court found the objections well-taken. The trial court noted Christina's testimony that she plans on Halloran moving in with her upon Halloran's release and that the two would raise Samuel together. The trial court characterized this plan as implausible and not in Samuel's best interest, stating,
 {¶ 38} "Prior to this case Samuel was passed around with the same people who now state they can provide a stable and permanent home for him. However, as previously noted, the most stability Samuel has ever known has been while he has been in the care of his maternal aunt, Treyvon [M.]. The court finds the continuation of Samuel in his aunt's home to be in Samuel's best interest. Further, a grant of permanent custody with the plan of adoption will facilitate this permanent plan."
 {¶ 39} The court found by clear and convincing evidence that, pursuant to R.C. 2151.414(B)(1) and R.C. 2151.414(E)(1), (4), (13), and (16), Samuel could not and should not be placed with either parent within a reasonable period and that, pursuant to R.C. 2151.414(D), permanent custody to LCCS would be in Samuel's best interest. Appellants now appeal,[2] setting forth the following assignment of error:
 {¶ 40} "The trial court erred to the prejudice of the appellant [sic] when it found that it was in the child's best interest that the plaintiff-appellee be granted permanent custody of the minor child."
 {¶ 41} R.C. 2151.414(B)(1) provides:
 {¶ 42} "(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:
 {¶ 43} "(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
 {¶ 44} "* * *."
 {¶ 45} This section requires the court to make two findings before granting permanent custody to the movant: (1) that a grant of permanent custody to the agency is in the child's best interest, and (2) that the child cannot be placed with either parent within a reasonable period of time or should not be so placed. Appellants do not challenge the trial court's finding that Samuel cannot be placed with either parent or should not be so placed. Neither parent contended during the proceedings that they were in a position to have Samuel placed with them. Instead, Norbert and Christina challenge the trial court's finding that it is in Samuel's best interest to award permanent custody to LCCS to effectuate adoption by Treyvon.
 {¶ 46} R.C. 2151.414(D) lists the factors the court shall consider in order to determine the best interests of the child. That section provides:
 {¶ 47} "(D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:
 {¶ 48} "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 {¶ 49} "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 {¶ 50} "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 {¶ 51} "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
 {¶ 52} "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.
 {¶ 53} "* * *."
 {¶ 54} As noted in the statute, a court's findings under these sections must be supported by clear and convincing evidence. The Supreme Court of Ohio has held that clear and convincing evidence is:
 {¶ 55} "that measure or degree of proof which is more than a mere `preponderance of the evidence,' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 56} With regard to R.C. 2151.414(D)(1), the child's interaction and interrelationship with relatives and caregivers, the trial court found and the record established that Samuel was "flourishing" with Treyvon and was close in age to Treyvon's son, who is like a sibling to Samuel. The record also established that Samuel is close to his siblings and to Christina. However, as noted by the guardian ad litem and established in the record, Samuel's siblings are much older than he is and will soon be out of the house. Moreover, Christina is no longer a young woman. The court also noted Treyvon's testimony that she would not deny visitation between Samuel and his siblings and grandmother.
 {¶ 57} R.C. 2151.414(D)(2) directs the trial court to consider the child's wishes as expressed through his guardian ad litem. Samuel's guardian ad litem, after carefully considering all of the circumstances, expressed the opinion that Samuel's best interest would be served through a grant of permanent custody to LCCS and subsequent adoption by Treyvon.
 {¶ 58} As for R.C. 2151.414(D)(3), the custodial history of the child, at the time of the hearing, Samuel had lived with Treyvon for nearly half his life, longer than he had lived anywhere else. As the trial court noted, this was the most stable placement Samuel had ever had. As for R.C. 2151.414(D)(4), whether a secure placement can be achieved without permanent custody to LCCS, the trial court and the guardian ad litem noted, and the record bore out, that Samuel's prospect for stability with his parents is slim. Christina's plan to raise Samuel with Halloran in the house is, as the trial court noted, not "plausible." Samuel's best opportunity is adoption into a loving, stable family with a child his own age without the threat of that placement ever being in jeopardy.
 {¶ 59} Based upon a thorough examination of the record, we find that the evidence clearly and convincingly supports the trial court's finding that a grant of permanent custody to LCCS is in Samuel's best interest. Appellants' assignment of error is found not well-taken.
 {¶ 60} Upon due consideration, we find that substantial justice was done the parties complaining, and the decision of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellants are ordered to pay the court costs of this appeal.
JUDGMENT AFFIRMED.
Handwork, P.J., Pietrykowski, J., Lanzinger, J. concur.
[1] On January 3, 2002, the trial court awarded temporary custody of Samuel to LCCS, effective November 25, 2001, to enable LCCS to later file for permanent custody.
[2] Although the attorney writing the brief often refers to "appellant" in the singular, the record reflects that both Norbert and Christina have appealed and that the attorney has been appointed to represent both. We therefore assume that the brief is filed on behalf of both appellants.